# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| W. MITT ROMNEY, in his official capacity as Governor of the Commonwealth of Massachusetts, | ) ) ) | |
| | ) | Civil Action No. 05-11821 GAO |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| DONALD H. RUMSFELD, in his official capacity as Secretary of Defense of the United States of America, <u>et al.</u>, | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S <u>MOTION FOR A TEMPORARY RESTRAINING ORDER</u>

PETER D. KEISLER
Assistant Attorney General

CARL J. NICHOLS
Deputy Assistant Attorney General

VINCENT M. GARVEY
Deputy Branch Director

ANDREW H. TANNENBAUM
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Tel: (202) 514-4263; Fax: (202) 616-8202
andrew.tannenbaum@usdoj.gov

MICHAEL J. SULLIVAN
United States Attorney

MARK T. QUINLIVAN
Assistant U.S. Attorney
John Joseph Moakley U.S. Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
Tel: (617) 748-3606; Fax: (617) 748-3969
mark.quinlivan@usdoj.gov

## INTRODUCTION

Plaintiff W. Mitt Romney, the Governor of the Commonwealth of Massachusetts, seeks a temporary restraining order against the Secretary of Defense ("Secretary"), the Defense Base Closure and Realignment Commission (the "Commission"), and the individual members of the Commission, preventing them recommending the transfer of aircraft from (but not the closure of[1]) the Otis Air National Guard Base ("Otis") to the President of the United States on September 8, 2005, pursuant to the Defense Base Closure and Realignment Commission Act (the "Act" or "BRAC Act"), see 10 U.S.C. § 2687 note.   Plaintiff's request should be denied.   This Court lacks subject matter jurisdiction to entertain plaintiff's request.  Plaintiff challenges the recommendations of the Secretary and Commission, but such a challenge is precluded by the Supreme Court's decision in Dalton v. Specter, 511 U.S. 462 (1994), as both the United States Court of Appeals for the Third and Seventh Circuits have now ruled.  See Blagojevich v. Rumsfeld, No. 05-3595, slip op. at 2 (7th Cir. Sept. 7, 2005) (attached as Exhibit 2); Corzine v. Rumsfeld, No. 05-4127, slip op. at 1 (3d Cir. Sept. 7, 2005) (attached as Exhibit 3).

Plaintiff's claims also suffer from fundamental Article III ripeness flaws.  Any of the ultimate harms to the size and strength of the Massachusetts National Guard alleged by Plaintiff to stem from the Commission's recommendations simply cannot be inflicted until the Commission's recommendations are implemented, a process which is at least months away if such implementation even occurs.  Similarly, Plaintiff lacks standing because the Commonwealth of Massachusetts has not suffered, and cannot suffer, any concrete and particularized injury solely from the recommendations of the Secretary or Commission.  Assuming the Commission issues its report on

---

[1] See Appendix Q, Text of 2005 Defense Base Closure and Realignment Commission Final and Approved Recommendations at 56-58 & n.120 (attached as Exhibit 1).  Until the final report is delivered to the President, this language is subject to further technical amendment.

September 8, 2005 containing recommendations regarding Otis, the President still has the power to reject the report, and Congress has the power to pass legislation to reject it as well.

Plaintiff also has failed to establish a likelihood of success on the merits or the existence of irreparable harm. Even were the Court to reach the merits of Plaintiff's claims, those claims fail as a matter of law. The statute upon which Plaintiff primarily relies – 32 U.S.C. § 104(c) – does not require the federal government to seek the consent of the many different states' governors for the relocation of the federal government's own military aircraft pursuant to the BRAC process. Any contrary interpretation of would ignore the text of § 104(c), the exhaustive scheme and important purposes of the Act, and simple common sense.

Nor has Plaintiff established irreparable harm associated with the issuance of the Commission's report or a likelihood of success on the merits. The sole alleged "harm" that is imminent relates to the Commission's anticipated September 8, 2005 transmission to the President of its report. But the recommendations of the Secretary and Commission – which are the only recommendations at issue in this litigation (indeed, Plaintiff has not even sued the President and only seeks a preliminary injunction against the Commission) – are ***never*** subject to judicial review, precisely because they are only recommendations and alone have no consequences for Otis.

While Plaintiff has demonstrated no irreparable injury requiring a temporary restraining order, an injunction prohibiting the Commission from including its recommendations related to Otis in its report would disrupt the carefully tailored statutory scheme. The Act requires the transmission of the report to the President by September 8, 2005, Act at § 2914(d), but it contains no mechanism for additional submissions after that date unless the President rejects the report in its entirety. Thus, it is simply unclear at this time exactly how any such recommendation will be reinstated. An

injunction that disrupts this schedule would cause real and imminent harm to the Government, and public – harm which far outweighs the allegations of speculative harm alleged by Plaintiff.

For all these reasons, plaintiff's request for a temporary restraining order should be denied, and this action should be dismissed for lack of subject matter jurisdiction.  .

## **BACKGROUND**

Against a history of "repeated, unsuccessful, efforts to close military bases in a rational and timely manner," Dalton, 511 U.S. at 479 (Souter, J., concurring in part and concurring in judgment), Congress adopted the Act "to provide a fair process that will result in the timely closure and realignment of military installations inside the United States," Act at § 2901(b).  The Act initially provided for base closures and realignments in 1991, 1993, and 1995, and in 2001 it was amended to provide for the current 2005 round.  See Pub. L. No. 107-107, §§ 3001-3008, 115 Stat. 1012, 1342-53.  Until its expiration on April 15, 2006, the Act is "the *exclusive* authority for selecting for closure and realignment, or for carrying out any closure or realignment of, a military installation inside the United States."  Act at § 2909(a) (emphasis added).

Through a detailed process, the Act assigns specific roles and strict deadlines to several federal actors.  The 2005 BRAC process began when the Secretary of Defense certified to Congress a need to close and realign military installations, and that such action would "result in annual net savings for each of the military departments."  Act at § 2912(b)(1)(B).  After this certification, the President had until March 15, 2005 to nominate for Senate consideration individuals to serve on the independent BRAC Commission (which he timely did).  Id. at § 2912(d).  Had the President failed to nominate commissioners by this date, the 2005 BRAC process would have terminated.  Id. at § 2912(d)(2).

Next, the Secretary had until May 16, 2005 to submit to the Commission a list of U.S. military installations that he recommends for closure or realignment.[2] Id. at § 2914(a).  In compiling the list, the Secretary was required to "consider all military installations inside the United States equally without regard to whether the installation has been previously considered or proposed for closure or realignment by the Department." Id. at § 2903(c)(3)(A).  The Act imposes significant limitations on the facts that the Secretary may look to in proposing base closures and realignments. First, the Secretary had to use a previously established "force-structure plan" and a "comprehensive inventory of military installations" as the bases for his selections.  Id. at § 2912(a)(1).  In addition, the Act specifies four "military value criteria," id. at § 2913(b), and four "other criteria," id. at § 2913(c), for the Secretary to use in making his recommendations; these criteria, along with the force-structure plan and inventory, provide the "only criteria" on which he was permitted to rely, id. at § 2913(f).

After receiving the Secretary's recommendations, the Commission held public hearings and now must prepare a report reviewing the Secretary's recommendations and making its own recommendations.  Id. at § 2903(d).  The Commission may revise the Secretary's recommendations where it finds "that the Secretary deviated substantially from the force-structure plan and final criteria." Id. at § 2903(d)(2)(B).  If the Commission seeks to close or realign an installation that the Secretary has not recommended for closure or realignment, or if it seeks to increase the extent of a realignment, additional procedures apply.  See id. at §§ 2903(d)(2)(C)-(D); 2914(d)(3), (d)(5).  The Commission's report must be provided to the President by September 8, 2005.  Id. at § 2914(d).

---

[2]  The Secretary submitted his list on May 13, 2005.

Not later than September 23, 2005, the President must either approve or disapprove of the Commission's recommendations in their entirety. Id. at § 2914(e)(1). If he rejects the recommendations, the Commission may revise its list and resubmit it to the President by October 20, 2005. Id. at § 2914(e)(2). Presidential rejection of the revised list terminates the BRAC process. Id. § 2914(e)(3). If, however, the President approves either the original or revised list, he must send the approved list and a certification of approval to Congress. Id. at § 2903(e)(2), (e)(4).

Finally, if Congress does not enact a joint resolution disapproving the Presidentially-approved Commission's recommendations within 45 legislative days after receiving the President's certification (or adjournment sine die for the session), the Secretary must close and realign each installation so recommended. Id. at § 2904. It is only at this point – after the Secretary's review and recommendations, the Commission's review and recommendations, the President's review and acceptance (if any), and the failure of Congress to pass legislation rejecting the recommendations – that any military installations actually may be closed or realigned.[3]

## STANDARD OF REVIEW

Whether a temporary restraining order or preliminary injunction should issue ordinarily depends upon a consideration of the following factors: (1) whether the moving party has demonstrated a likelihood of success on the merits; (2) whether the moving party has demonstrated the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no

---

[3]    The Act specifies in great detail the procedures for implementing any closures or realignments that are required after the BRAC process is completed. Id. at § 2905.

injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.  See Air Lline Pilots Ass'n v. Guilford Transp. Indus., Inc., 399 F.3d 89, 95 (1st Cir. 2005).

Although the courts ordinarily consider each of these factors, the first is paramount.  The First Circuit has emphasized that "[t]he *sine qua non* of this four-part inquiry is likelihood of success on the merits; if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."  New Comm Wireless Servs., Inc. v. SpringCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).  In cases in which the district court lacks subject matter jurisdiction, a party's likelihood of success is "nil."  Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Air Lines, Inc., 826 F.2d 1141, 1145 (1st Cir. 1987).

## ARGUMENT

## I.    PLAINTIFF HAS NO LIKELIHOOD OF SUCCESS ON THE MERITS

Plaintiff cannot demonstrate any likelihood of success on the merits, both because this Court lacks subject matter jurisdiction to entertain his claims, and because those claims are fail as a matter of law on the merits.

### A.    *Dalton v. Specter* precludes review of the Commission's recommendations

Dalton – exactly like here – involved a challenge to the reports and recommendations submitted by the Secretary and Commission during the BRAC process.[4]  511 U.S. at 469.  Relying on its decision in Franklin v. Massachusetts, 505 U.S. 788 (1992), the Supreme Court found that those reports "'carr[y] no direct consequences' for base closings."  Id. (quoting 505 U.S. at 798).

---

[4]  The Act at issue in Dalton was amended by Pub. L. No. 107-107, §§ 3001-3008, 115 Stat. 1012, 1342-53 (2001), and Pub. L. No. 108-375, 118 Stat. 2064, 2132 (2004) to authorize the 2005 round of military base closings and realignments at issue here; those amendments did not change the Act in any way relevant to the analysis in Dalton.

Rather, "the Secretary's and Commission's reports serve 'more like a tentative recommendation than a final and binding determination.' The reports are, 'like the ruling of a subordinate official, not final and therefore *not subject to review*.'" Id. at 469-70 (emphasis added) (internal citations omitted; quoting 505 U.S. at 798); see also Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp., 333 U.S. 103, 110-11 (1948) ("administrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process"). Under this clear holding, judicial review of the Commission's vote to include a recommendation related to Otis is precluded, as both the United States Court of Appeals for the Third and Seventh Circuits have now held. See Blagojevich, No. 05-3595, slip op. at 2 ("Section 104(c) does not purport to regulate communications or recommendations within the Executive Branch, and those communications are not otherwise final and reviewable agency action.") (citing Dalton); Corzine, No. 05-4127, slip op. at 1 ("The judgment of the District Court, finding that it lacked subject matter jurisdiction based on the holding of the United States Supreme Court in Dalton v. Specter, 511 U.S. 462 (1994), is summarily affirmed.").

Because the challenge in Dalton was brought under the Administrative Procedures Act ("APA"), Plaintiff here has not sued under the APA and presumably will assert that the APA's requirement of "final agency action" is inapplicable. But Plaintiff cannot circumvent the fundamental principles announced in Dalton through creative pleading. Indeed, by failing to bring this case under the APA, Plaintiff has identified no substantive cause of action under which this case may proceed.[5] Moreover, the concept of "final agency action" existed long before Dalton was

_____

[5] The Declaratory Judgment Act ("DJA") alone does not create a substantive cause of action. See Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671-672 (1950). Indeed, if Plaintiff could assert a cause of action solely under the DJA, then the comprehensive requirements for

decided and the APA was enacted.  Whether or not the APA is invoked, only challenges to agency action that is final are subject to review.

The Supreme Court's decision in <u>Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.</u>, 333 U.S. 103 (1948) is directly on point.  As here, the plaintiffs in <u>Waterman</u> sought review (not under the APA) of a recommendation made by an administrative agency (the Civil Aeronautics Board) to the President, who was the final decision-maker.  333 U.S. at 105-06.  Finding that the challenged recommendation "grants no privilege and denies no right," but rather was, at most, merely a "step, which if erroneous will mature into a prejudicial result," the Supreme Court held that judicial review was not available.  <u>Id.</u> at 112.  "[A]dministrative orders are not reviewable unless and until they impose an obligation, deny a right or fix some legal relationship as a consummation of the administrative process. * * * To revise or review an administrative decision, which has only the force of a recommendation to the President, would be to render an advisory opinion in its most obnoxious form – advice that the President has not asked, tendered at the demand of a private litigant, on a subject concededly within the President's exclusive, ultimate control."  <u>Id.</u>. at 112-13.

<u>Waterman</u> is based on both prudential considerations and fundamental constitutional principles and applies directly to Plaintiff's suit – irrespective of their failure to plead an APA claim.  Indeed, not only is <u>Waterman</u> consistent with the principles of nonreviewability in <u>Dalton</u>, but the

---

challenging agency action that Congress prescribed in the APA would be rendered meaningless.  The APA, for example, allows judicial review for only specific kinds of agency action, and only if such action is final and creates legal rights or obligations.  <u>See, e.g.,</u> <u>Norton v. Southern Utah Wilderness Alliance</u>, 124 S. Ct. 2373, 2378 (2004); <u>Bennett v. Spear</u>, 520 U.S. 154, 178 (1997).  The APA also provides only for limited review of agency action pursuant to a standard deferential to the agency.  <u>See, e.g.,</u> 5 U.S.C. § 706(2)(A) (agency action should not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law").  Nor does 32 U.S.C. § 104(c) provide an implied right of action.  Plaintiff has not even alleged that such a right of action exists.

Court's reasoning in <u>Waterman</u> applies equally to Article III's standing and ripeness requirements (which are discussed below). On their own, the Commission's BRAC recommendations (like those of the Civil Aeronautics Board) carry no direct consequences for base closings or realignments. They are merely a step along the way. As such:

> The legal incongruity of interposing judicial review between the action by the [Commission] and that by the President are as great as the practical disadvantages. The latter arise chiefly from the inevitable delay and obstruction in the midst of the administrative proceedings. The former arises from the fact that until the President acts there is no final administrative determination to review.

<u>Id.</u> at 112. To accede to Plaintiff's request for judicial review at this time thus not only would represent a needless and burdensome intrusion into the BRAC process, but even more fundamentally, it would exceed the Court's authority under Article III. And the APA, or lack thereof, is simply not crucial to this equation.

Nor does the holding in Part I of <u>Dalton</u> somehow limit this fundamental principle to APA cases. The Supreme Court's holding discussed "final agency action" within the context of an APA case because it was addressing an APA case. 511 U.S. at 469-70. But the Court's reasoning undoubtedly applies beyond this limited context. Indeed, in Part II of its decision, the Supreme Court relied on <u>Waterman</u> ("a case analogous to the present one") and specifically referenced its decision in that case to deny review of the Civil Aeronautics Board's action. <u>Dalton</u>, 511 U.S. at 475. It does not matter that this discussion occurred in Part II of its decision because the Court clearly was referring with approval to its prior decision regarding judicial review of the Board's

action (not the President's), and the reviewability of those types of interim actions was the focus of Part I.[6]

Article III of the Constitution precludes a federal court from reviewing non-final agency actions. <u>Dalton</u> and a host of cases before it confirms this, and Plaintiff cannot sidestep this basic premise through clever pleading.[7]

**B.    The statutory scheme, objectives and history of BRAC demonstrate a Congressional intent to preclude judicial review of the Commission's recommendations**

Judicial review of decisions made under the Act also is precluded because "the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved," <u>Block v. Community Nutrition Institute</u>, 467 U.S. 340, 345 (1984), all manifest a clear

---

[6]    But even Part I of <u>Dalton</u> supports the premise that judicial review of non-final agency action is precluded in non-APA cases. This is best evidenced by the Court's heavy reliance on its prior decision in <u>Franklin v. Massachusetts</u>, 505 U.S. 788 (1992), in which the Court cited <u>Waterman</u> for the principle that non-final agency action is "not subject to review." <u>Franklin</u>, 505 U.S. at 798 (<u>citing</u> <u>Waterman</u>, 333 U.S. at 109; <u>United States v. George S. Bush & Co.</u>, 310 U.S. 371, 379 (1940)).

[7]    In Part II of <u>Dalton</u>, the Supreme Court also concluded, albeit regarding the President's decision-making in the BRAC process, that any non-APA claims challenging the President's authority under the Act are not constitutional claims but rather are statutory. 511 U.S. at 477. And "[w]here a statute, such as the 1990 Act, commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available." 511 U.S. at 477. This reasoning should apply with equal force to Plaintiff's alleged non-APA challenges to the preliminary recommendations of the Commission. Those challenges are not subject to judicial review because the Act commits decisionmaking to the discretion of the Commission. Indeed, the D.C. Circuit found this to be the case as to the Secretary while analyzing an earlier version of the statutory scheme related to base closings. <u>See</u> <u>National Federation of Fed. Employees v. United States</u>, 905 F.2d 400, 405-06 (D.C. Cir. 1990) ("even if appellants had standing to challenge the Secretary's decisions, their claim is nonjusticiable because the Secretary's decisions were 'committed to agency discretion by law'"). This is so even though the Act sets forth criteria to be considered by the actors in the process; "the rub is that the subject matter of those criteria is not 'judicially manageable.'" <u>Id.</u> at 405; <u>See also</u> <u>Cohen v. Rice</u>, 992 F.2d 376, 382 (1st Cir. 1993) (finding both procedural and substantive challenges to the BRAC Commission's recommendations to be nonreviewable).

- 10-

intent not to have judges reviewing the decision to recommend the closure or realignment of individual military installations.  Justice Souter's concurrence in <u>Dalton</u>, joined by three other Justices, persuasively demonstrates why no judicial review – whether under the APA or not – is permitted under the Act.[8]  After a careful review of the "text, structure, and purpose of the Act," Justice Souter concluded that "judicial review of the Commission's or the Secretary's compliance with it is precluded."  511 U.S. at 479.  He highlighted several reasons supporting this conclusion, the first being the "tight and rigid deadlines on administrative review and Presidential action" throughout the Act.  <u>Id.</u>  Regarding these deadlines, he wrote:

> It is unlikely that Congress would have insisted on such a timetable for decision and implementation if the base-closing package would be subject to litigation during the periods allowed, in which case steps toward closing would either have to be delayed in deference to the litigation, or the litigation might be rendered moot by completion of the closing process.  That unlikelihood is underscored by the provision for disbanding the Commission at the end of each base-closing decision round, and for terminating it automatically at the end of 1995, whether or not any bases have been selected to be closed.  If Congress intended judicial review of individual base-closing decisions, it would be odd indeed to disband biennially, and at the end of three rounds to terminate, the only entity authorized to provide further review and recommendations.

<u>Id.</u> at 481.

Next, Justice Souter stressed "the linchpin of this unusual statutory scheme * * * its all-or-nothing feature."  <u>Id.</u>  That the President and Congress must promptly accept or reject the entire package of base closing recommendations – and may not "'cherry pick'" – "can only represent a considered allocation of authority between the Executive and Legislative Branches to enable each to reach important, but politically difficult, objectives."  <u>Id.</u>  He continued:

---

[8]  No Justice disagreed with Justice Souter's analysis.

If judicial review could eliminate one base from a package, the political resolution embodied in that package would be destroyed; if such review could eliminate an entire package, or leave its validity in doubt when a succeeding one had to be devised, the political resolution necessary to agree on the succeeding package would be rendered the more difficult, if not impossible. *The very reasons that led Congress by this enactment to bind its hands from untying a package, once assembled, go far to persuade me that Congress did not mean the courts to have any such power through judicial review.*

Id. at 481-82 (emphasis added).

Finally, Justice Souter noted "two secondary features" of the Act that support the conclusion that judicial review of BRAC decision-making is barred. First, "the Act provides nonjudicial opportunities" for review: the Commission and the Comptroller General review the Secretary's recommendations; the President reviews the Commission's report; and Congress reviews the President's decision. Id. at 482. And second, the Act contains one express provision for judicial review for claims brought under the National Environmental Policy Act of 1969, 42 U.S.C. § 4321, et seq., challenging implementation of a base closing under certain circumstances. 511 U.S. at 483. "This express provision for judicial review of certain NEPA claims within a narrow time frame supports the conclusion that the Act precludes judicial review of other matters, not simply because the Act fails to provide expressly for such review, but because Congress surely would have prescribed similar time limits to preserve its considered schedules if review of other claims had been intended." Id.

Accordingly, Justice Souter found that, "[w]hile no one aspect of the Act, standing alone, would suffice to overcome the strong presumption in favor of judicial review, this structure (combined with the Act's provision for Executive and congressional review, and its requirement of time-constrained judicial review of implementation under NEPA) can be understood no other way than as precluding judicial review of a base-closing decision under the scheme that Congress, out

of its doleful experience, chose to enact." Id. at 483-84. This detailed analysis applies equally whether or not the challenge to actions taken under BRAC is made through the APA.

C.    There is no ripe controversy

"A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300 (1998) (quoting Thomas v. Union Carbide Agr. Prods. Co., 473 U.S. 568, 580-81 (1985) (additional citation and internal quotation marks omitted)). As the Supreme Court has analyzed, "[t]he core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." Franklin, 505 U.S. at 797).

The simple issue is whether the Commission's vote to recommend the relocation of Otis aircraft alone has consequences for Plaintiff, or whether the recommendation rests upon contingencies in the future that may alter or even prevent the recommended action from occurring. Here, the latter scenario is true. It may be possible today to engage in a debate about whether either 32 U.S.C. § 104 somehow prohibited the Secretary and Commission from undertaking their duties under the Act and merely making recommendations about an action that, if ultimately implemented, would cause a National Guard unit to lose aircraft (which is federal property). But Article III requires far more than mere debate. The ripeness requirement is "designed to 'prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" National Park Hospitality Ass'n v. Department of Interior, 538 U.S. 803, 807-88 (2003) (quoting Abbott Labs, 387 U.S. at 148-49). The Commission's vote to recommend the relocation

- 13-

of Otis's aircraft will only be a recommendation, subject to possible rejection.  Plaintiff's challenge

to that vote are thus not ripe for review.

**D.    Plaintiff lacks standing**

For the same reasons that this case does not present a ripe controversy, Plaintiff lacks Article

III standing.  The implementation of the Commission's recommendation regarding Otis is months

away and is subject to actions by both the President and Congress, each of which can prevent the

recommendations from occurring.  Thus, not only are Plaintiff's alleged injuries not imminent, they

are not even certain.  Indeed, the statute on which Plaintiff relies (assuming its applicability here)

precludes only actual changes to National Guard units absent gubernatorial consent.  Because the

Commission's vote to recommend the relocation of Otis aircraft cannot alone inflict any interest

protected by those statutes, Plaintiff lacks standing to challenge that vote.

**E.    Plaintiff's claims fail on the merits**

The aircraft used by Otis were bought and paid for by the federal government and remain

""the property of the United States," 32 U.S.C. § 710(a).  The plaintiff nevertheless claims that 32

U.S.C. § 104 require gubernatorial consent before the Commission or Secretary may recommend the

relocation of these federal military aircraft.  That assertion fails to state a claim for relief and would

support a summary judgment for Defendant as a matter of law.

32 U.S.C. § 104(c):

To secure a force the units of which when combined will form complete higher
tactical units, the President may designate the units of the National Guard, by branch
of the Army or organization of the Air Force, to be maintained in each State and
Territory, Puerto Rico, and the District of Columbia.  However, no change in the

branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor.[9]

This provision – which is separate and apart from the Act and in no way referenced therein – does not constrain actions taken pursuant to Act because both the plain text of 32 U.S.C. § 104(c), and the entire history and purpose of the BRAC process demonstrate that the requirement for gubernatorial consent does not apply to the exercise of any authority beyond 32 U.S.C. § 104. Well-established principles of statutory construction support this conclusion.

As a preliminary matter, Section 104(c), on its face, applies only to actual "change[s] in the branch, organization, or allotment of" a unit, and thus does not apply to the challenged **recommendations** for such changes. See Blagojevich. No. 05-3595, slip op. at 2 ("Section 104(c) does not purport to regulate communications or recommendations within the Executive Branch, and those communications are not otherwise final and reviewable agency action."). Section 104(c) also, on its face, does not apply to the relocation of aircraft, which is the only BRAC recommendation challenged in this suit. Unlike in the Rendell case, where the plaintiffs challenged a recommendation to "deactivate" a National Guard unit, here Otis will remain in place if the Commission's recommendations are implemented. The Commission's recommendation to relocate its aircraft is not a "change in the branch, organization, or allotment of" Otis; thus, Section 104(c) does not apply.

Moreover, if the Court finds that the language of the provision could be deemed applicable to the movement of aircraft, the text nonetheless illustrates that the second sentence in 32 U.S.C. § 104(c) merely constricts the first sentence of that provision. In other words, the "no change" absent

---

[9] Section 104(a) authorizes each state to "fix the location of the units and headquarters of its National Guard," and section 104(b) provides that, except as otherwise specifically provided in title 32, "the organization of" the Army National Guard and the Air National Guard "and the composition of [their] units" shall be the same as those of the Army and Air Force, respectively.

gubernatorial approval clause in sentence two is properly read only to limit actions taken under the first sentence's authorization of certain presidential "designat[ions]." The use of "However" to begin sentence two confirms this, as "however" is a proviso that necessarily refers to and limits what comes before. Provisos should be construed narrowly, see C.I.R. v. Clark, 489 U.S. 726, 739 (1989), "to refer only to the things covered by a preceding clause," Alaska v. United States, 125 S. Ct. 2137, 2159 (2005). Moreover, the words "branch" and "organization" appear in both sentences. In the first sentence, they describe the scope of the President's power, and in the second, they limit that power. This parallel construction further supports the conclusion that sentence two is meant to apply only to actions taken under the first sentence – not actions taken by the President (and others) under the entirely separate and distinct BRAC Act.

Furthermore, the entire purpose of the BRAC Act would be seriously undermined if 32 U.S.C. § 104(c) were applied as Plaintiff proposes, and the Court should read the two statutes to avoid such a result. See Morton v. Mancari, 417 U.S. 535, 551 (1974) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."). Plaintiff's expansive interpretation creates serious conflicts between Section 104(c) and the Act, which establishes a comprehensive set of procedural and substantive criteria to be used for making base closure and realignment decisions. As discussed in the background section and discussion above of Justice Souter's concurrence in Dalton, it also imposes strict deadlines on the various federal actors involved in the process. These complex procedures and firm deadlines are designed to be – and only may operate effectively if they remain – a wholly integrated package that is exclusive of and unimpeded by external requirements like permitting a veto by any state governor in the country. Section 104(c) must be read as inapplicable

to the Act; otherwise, these many carefully constructed procedures are severely undermined.[10]  Cf. United States v. Fausto, 484 U.S. 439, 453 (1988) ("This classic judicial task of reconciling many laws enacted over time, and getting them to 'make sense' in combination, necessarily assumes that the implications of a statute may be altered by the implications of a later statute.").

The conflicts between a gubernatorial consent requirement (if it would otherwise apply) and the Act take several forms.  First, where it applies and while it is in force, the Act is expressly designated as the "*exclusive* authority" for the closure or realignment of federal military installations in the United States.  Act at § 2909(a) (emphasis added).  This exclusivity would be eviscerated if state governors – who are not given any selection authority by the Act – were nevertheless allowed to deselect particular installations from the list of proposed closures and realignments.  It also would be a serious incursion on the Act's comprehensive procedural scheme to allow a different set of actors, who are operating at an entirely different level of government, to play such a crucial and potentially disruptive role in determining the federal installations to be closed or realigned.  Indeed, Plaintiff's interpretation of Section 104(c) would give state governors powers that the Act withholds

---

[10]  If this Court finds that Section 104(c) does reach beyond Section 104, then it must further be concluded that the BRAC Act impliedly repeals (or, perhaps more accurately, temporarily suspends) section 104(c) to the extent that the proviso interferes with and constrains the exercise of authority under the Act.  See Posadas v. National City Bank, 296 U.S. 497, 503 (1936) (describing the "well-settled" rule that "where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one").  The presumption against implied repeals is overcome where there exists a clear conflict between provisions enacted at different times or a clear indication that, in enacting the later statute, Congress intended to supplant the earlier one.  See Department of Transp. v. Public Citizen, 541 U.S. 752, 766-67 (2004); Branch v. Smith, 538 U.S. 254, 273 (2003); see also In re Glacier Bay, 944 F.2d 577, 583 (9th Cir. 1991) (holding that the Trans-Alaska Pipeline Authorization Act impliedly repealed the earlier Limitation Act because the former is "comprehensive" and its "scheme simply cannot work if the Limitation Act is allowed to operate concurrently").

from all of the federal actors on which it confers responsibility: the ability to block the closure or realignment of an individual installation for any reason whatsoever.[11]

Applying Section 104(c) to the Act also would unravel the exclusivity of the selection criteria that Congress has woven into the rules for both the Secretary and the Commission.  Under the Act, at § 2913(f), the "final selection criteria specified in [section 2913] shall be the only criteria to be used, along with the [Secretary's] force-structure plan and infrastructure inventory" in determining the Secretary's recommendations.  And, in applying these criteria, the Secretary must "consider all military installations inside the United States equally without regard to whether the installation has been previously considered or proposed for closure or realignment by the Department."  Act at § 2903(c)(3)(A).  The Commission, in turn, faces analogous restrictions, as it may depart from the Secretary's recommendations only if, among other things, it determines that he "deviated substantially from the force-structure plan and final criteria."  Id. at § 2903(d)(2)(B); see also id. at § 2914(d) (imposing other constraints).  This framework is designed to prevent the Secretary and Commission from making closure and realignment decisions on any criteria not described in the Act itself.  It would run contrary to this process and make no sense to inject into this structure the individual wishes of state governors.

_____

[11]  In addition, Congress knew how to confer a role on governors (and other non-federal entities) when it wanted them to have one: the Act expressly gives to state and local officials (including governors in some cases) the right to be consulted regarding certain federal actions, but these are actions implementing the list, after it has been approved. See Act at § 2905(b)(2)(D) & (E), (3)(B) & (D), (5)(B) & (C)(i).  In this context, the Act's contrasting silence about the role of state governors in the process of selecting bases for closure and realignment must be considered conclusive. See, e.g., Jama v. Immigration and Customs Enforcement, 125 S. Ct. 694, 700 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest.").

Finally, we must not overlook yet another outcome of reading Section 104(c) as applicable to actions under the Act. To do so fundamentally thwarts the broader goal of the Act itself, which was to replace an essentially ad hoc and politically unworkable process with a comprehensive, unified, and rational one "that will result in the timely closure and realignment of military installations inside the United States." Act at § 2901(b). Yet, Plaintiff asks the Court to – at least with respect to the National Guard – revive the problems that preceded the Act by returning to a system in which local politics, rather than national planning, determined which facilities were closed and which were spared. Such a result was sought to be avoided by the process established by and to be followed under the Act, and it should be avoided here too.[12]

## II.   PLAINTIFF HAS FAILED TO ESTABLISH IRREPARABLE HARM

For the reasons outlined above, the recommendations of the Secretary and Commission are not final; to the contrary, the implementation of the Commission's recommendations as to Otis would occur only if the President transmits the report to Congress (by September 23) and forty-five legislative days pass without Congressional action. Plaintiff therefore has not established that the State will suffer any irreparable harm from the transmission of the Commission's report to the President.

Indeed, the fact that the Commonwealth has waited until the literal eve of the Commission's deadline to seek a preliminary injunction, must be considered by the Court in deciding whether to

---

[12] Plaintiff's reliance on the Militia Clauses is plainly misplaced. As the Supreme Court has held: "far from being a limitation on [certain of Congress's other constitutional powers], the Militia Clauses are – as the constitutional text plainly indicates – additional grants of power *to Congress*." Perpich v. Department of Defense, 496 U.S. 334, 349 (1999) (emphasis added) (discussing its prior decision in Selective Draft Law Cases, 245 U.S. 366 (1918)). Plaintiff also has "reserve[d] for future briefing," and thus has not relief on for purposes of this motion, his claim under 10 U.S.C. § 18238.

grant Plaintiff's request.  See Tom Doherty Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 39 (2d Cir. 1995) ("A district court should generally consider delay in assessing irreparable harm.") (citations omitted).

By contrast, the Government faces real and imminent harm should this Court enjoin the Commission from including its recommendations related to Otis.  The Act requires the transmission of the report to the President by September 8, 2005.  Act at § 2914(d).  And there are no provisions that discuss additional Commission submissions after this transmission, see Act, generally, unless the President rejects *the entire list* and sends it back to the Commission for resubmission, id. at § 2914(e)(2).  The extremely limited statutory timeline, which cannot be altered, is an essential part of the statutory scheme that Congress has crafted to serve the public interest.  Any injunction that threatens to interfere with or derail that scheme would cause serious harm to the government – and to the public interest, as the BRAC Act is designed to save taxpayer dollars and strengthen the military.  Such harm far outweighs the allegations of speculative and future harms alleged by Plaintiff.  See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.").[13]

## CONCLUSION

For all of these reasons, this Court should deny Plaintiff's request for a temporary restraining order, and dismiss this action with prejudice.

---

[13]    Should the Court grant Plaintiff's motion, Defendants respectfully request that the Court convert Plaintiff's motion into a motion for, and enter, a preliminary injunction.  Although Defendants of course maintain that Plaintiff is not entitled to such relief, at this late hour a temporary restraining order will have the same practical effect as a preliminary injunction, and would be appealable as such.  By correctly identifying the order as a preliminary injunction, the Court would remove any lack of clarity as to its immediate appealability.

Respectfully submitted,

PETER D. KEISLER                          MICHAEL J. SULLIVAN
Assistant Attorney General                United States Attorney

CARL J. NICHOLS                           MARK T. QUINLIVAN
Deputy Assistant Attorney General         Assistant U.S. Attorney
                                          John Joseph Moakley U.S. Courthouse
VINCENT M. GARVEY                         1 Courthouse Way, Suite 9200
Deputy Branch Director                    Boston, MA 02210
                                          Tel: (617) 748-3606; Fax: (617) 748-3969
ANDREW H. TANNENBAUM                      mark.quinlivan@usdoj.gov
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, D.C.  20044
Tel: (202) 514-4263; Fax: (202) 616-8202
andrew.tannenbaum@usdoj.gov

Dated:  September 8, 2005

# Appendix Q

Text of 2005 Defense Base Closure and
Realignment Commission
Final and Approved Recommendations

A Bill to Make Recommendations to the President
Under the Defense Base Closure and Realignment Act of 1990

A Bill to Make Recommendations to the President
Under the Defense Base Closure and Realignment Act of 1990
Chapter III.  Department of the Air Force Recommendations

### 94. Otis Air National Guard Base, MA, Lambert St. Louis International Airport Air Guard Station, MO, and Atlantic City Air Guard Station, NJ (AF 25)

   a. **Realign Otis ANGB, MA.** Distribute the fifteen F-15 aircraft assigned to the 102[d] Fighter Wing's (ANG) to meet the Primary Aircraft Authorizations (PAA) requirements established by the Base Closure and Realignment recommendations of the Secretary of Defense, as amended by the Defense Base Closure and Realignment Commission.  The 253[d] Combat Communications Group, and 267th Communications Squadron will remain in place at Otis, with 104th Fighter Wing at Barnes providing administrative support as the parent wing.  An air sovereignty alert (ASA) facility will be constructed at Barnes Municipal Airport Air Guard Station, MA.[119]  Firefighter positions from Otis will move to Barnes Municipal Airport Air Guard Station, MA.

   If the Commonwealth of Massachusetts decides to change the organization, composition and location of the 102[d] Fighter Wing (ANG) to integrate the unit into the Future Total Force, all other personnel allotted to the 102[d] Fighter Wing (ANG) will remain in place and assume a mission relevant to the security interests of the Commonwealth of Massachusetts and consistent with the integration of the unit into the Future Total Force, including but not limited to air mobility, C4ISR, Information Operations, engineering, flight training or unmanned aerial vehicles.  Where appropriate, unit personnel will be retrained in skills relevant to the emerging mission.

   This recommendation does not effect a change to the authorized end-strength of the Massachusetts Air National Guard.  The distribution of aircraft currently assigned to the 102[d] Fighter Wing (ANG) is based upon a resource-constrained determination by the Department of Defense that the aircraft concerned will better support national security requirements in other locations and is not conditioned upon the agreement of the commonwealth.

   b. **Realign Lambert-St. Louis International Airport Air Guard Station, St. Louis, MO.** Distribute the fifteen F-15 aircraft assigned to the 131st Fighter Wing to meet the Primary Aircraft Authorizations (PAA) requirements established by the Base Closure and Realignment recommendations of the Secretary of Defense, as amended by the Defense Base

---

If the State of Maryland decides to change the organization, composition and location of the 175th Wing (ANG) to integrate the unit into the Future Total Force, all other personnel allotted to the 175th Wing (ANG) will remain in place and assume a mission relevant to the security interests of the State of Maryland and consistent with the integration of the unit into the Future Total Force, including but not limited to air mobility, C4ISR, Information Operations, engineering, flight training or unmanned aerial vehicles.  Where appropriate, unit personnel will be retrained in skills relevant to the emerging mission."

This recommendation does not effect a change to the authorized end-strength of the Maryland Air National Guard.  The distribution of aircraft currently assigned to the 175th Wing (ANG) is based upon a resource-constrained determination by the Department of Defense that the aircraft concerned will better support national security requirements in other locations and is not conditioned upon the agreement of the state."

[119] As a technical correction, the Commission deleted the language "Bradley International Airport Air Guard Station, CT" and inserted in its place the language "Barnes Municipal Airport Air Guard Station, MA" to reflect the intent of the Commission.  Because the air superiority fighter basing in that region was relocated from Otis ANGB to Barnes AGS, the ASA facility must also be relocated to Barnes AGS, rather than to Bradley Field.

A Bill to Make Recommendations to the President
Under the Defense Base Closure and Realignment Act of 1990
Chapter III. Department of the Air Force Recommendations

Closure and Realignment Commission. The 157th Air Operations Group (AOG) and the 218th Engineering Installation Group (EIG) will relocate from Jefferson Barracks geographically separated unit (GSU) into space at Lambert International. Jefferson Barracks real property accountability will transfer to the Army.

If the State of Missouri decides to change the organization, composition and location of the 131st Fighter Wing (ANG) to integrate the unit into the Future Total Force, all other personnel allotted to the 131st Fighter Wing (ANG) will remain in place and assume a mission relevant to the security interests of the State of Missouri and consistent with the integration of the unit into the Future Total Force, including but not limited to air mobility, C4ISR, Information Operations, engineering, flight training or unmanned aerial vehicles. Where appropriate, unit personnel will be retrained in skills relevant to the emerging mission.

This recommendation does not effect a change to the authorized end-strength of the Missouri Air National Guard. The distribution of aircraft currently assigned to the 131st Fighter Wing (ANG) is based upon a resource-constrained determination by the Department of Defense that the aircraft concerned will better support national security requirements in other locations and is not conditioned upon the agreement of the state.

   o Establish 18 PAA F-15 aircraft at the 125th Fighter Wing, Jacksonville International Airport Air Guard Station, Florida (ANG);

   o Establish 18 PAA F-16 aircraft at the 177th Fighter Wing, Atlantic City International Airport Air Guard Station, New Jersey (ANG);

   o Establish 18 PAA F-16 aircraft at the 158th Fighter Wing, Burlington International Airport Air Guard Station, Vermont (ANG).[120]

---

[120] By Motion 94-4A, the Commission struck the entire text of recommendation 94, which read "**Close Otis ANGB, MA.** The 102[d] Fighter Wing's F-15s will be distributed to the 125[th] Fighter Wing, Jacksonville International Airport Air Guard Station, FL (three aircraft), and 177[th] Fighter Wing, Atlantic City International Airport Air Guard Station, NJ (12 aircraft). The 253[d] Combat Communications Group, and 267[th] Communications Squadron will remain in place at Otis, with 104[th] Fighter Wing at Barnes providing administrative support as the parent wing. An air sovereignty alert (ASA) facility will be constructed at Bradley International Airport Air Guard Station, CT. Firefighter positions from Otis will move to Barnes Municipal Airport Air Guard Station, MA. **Realign Lambert-St. Louis International Airport Air Guard Station, St. Louis, MO.** The 131[st] Fighter Wing's F-15s (15 aircraft) will distribute to the 57[th] Fighter Wing, Nellis Air Force Base, NV (nine aircraft), and 177[th] Fighter Wing, Atlantic City International Airport Air Guard Station, NJ (six aircraft). **Realign Atlantic City International Airport Air Guard Station, NJ.** The 177[th] Fighter Wing's F-16s will be distributed to the 158[th] Fighter Wing, Burlington International Airport Air Guard Station, VT (three aircraft), and retire (12 aircraft). The wing's expeditionary combat support (ECS) elements will remain in place. Firefighter positions move to Scott Air Force Base, IL. The 157[th] Air Operations Group (AOG) and the 218[th] Engineering Installation Group (EIG) will relocate from Jefferson Barracks geographically separated unit (GSU) into space at Lambert International. Jefferson Barracks real property accountability will transfer to the Army.", and inserted in its place the language "**Realign Otis ANGB, MA**. Distribute the fifteen F-15 aircraft assigned to the 102[d] Fighter Wing's (ANG) to meet the Primary Aircraft Authorizations (PAA) requirements established by the Base Closure and Realignment recommendations of the Secretary of Defense, as amended by the Defense Base Closure and Realignment Commission. The 253[d] Combat Communications Group, and 267th Communications Squadron will remain in place at Otis, with 104th Fighter Wing at Barnes providing administrative support as the parent wing. An air sovereignty alert (ASA) facility will be constructed at Bradley International Airport Air Guard Station, CT. Firefighter positions from Otis will move to

A Bill to Make Recommendations to the President
Under the Defense Base Closure and Realignment Act of 1990
Chapter III. Department of the Air Force Recommendations

### 95. *W.K. Kellogg Airport Air Guard Station, MI (AF 27)*

a. **Realign W.K. Kellogg Airport Air Guard Station, MI.** Distribute the 15 A-10 aircraft assigned to the 110th Fighter Wing (ANG) to meet the Primary Aircraft Authorizations (PAA) requirements established by the Base Closure and Realignment recommendations of the Secretary of Defense, as amended by the Defense Base Closure and Realignment Commission. Establish a contiguous enclave for the 110th Fighter Wing (ANG) sufficient to support operations of that unit, including flight operations, and compatible with joint use of the Air Guard Station as a civilian airport. If the State of Michigan decides to change the organization, composition and location of the 110th Fighter Wing to integrate the unit into the Future Total Force, all other personnel allotted to the 110th Fighter Wing will remain in place and assume a mission relevant to the security interests of the State of Michigan and consistent

---

Barnes Municipal Airport Air Guard Station, MA. If the Commonwealth of Massachusetts decides to change the organization, composition and location of the 102$^d$ Fighter Wing (ANG) to integrate the unit into the Future Total Force, all other personnel allotted to the 102$^d$ Fighter Wing (ANG) will remain in place and assume a mission relevant to the security interests of the Commonwealth of Massachusetts and consistent with the integration of the unit into the Future Total Force, including but not limited to air mobility, C4ISR, Information Operations, engineering, flight training or unmanned aerial vehicles. Where appropriate, unit personnel will be retrained in skills relevant to the emerging mission. This recommendation does not effect a change to the authorized end-strength of the Massachusetts Air National Guard. The distribution of aircraft currently assigned to the 102$^d$ Fighter Wing (ANG) is based upon a resource-constrained determination by the Department of Defense that the aircraft concerned will better support national security requirements in other locations and is not conditioned upon the agreement of the commonwealth.

**Realign Lambert-St. Louis International Airport Air Guard Station, St. Louis, MO.** Distribute the fifteen F-15 aircraft assigned to the 131st Fighter Wing to meet the Primary Aircraft Authorizations (PAA) requirements established by the Base Closure and Realignment recommendations of the Secretary of Defense, as amended by the Defense Base Closure and Realignment Commission. The 157th Air Operations Group (AOG) and the 218th Engineering Installation Group (EIG) will relocate from Jefferson Barracks geographically separated unit (GSU) into space at Lambert International. Jefferson Barracks real property accountability will transfer to the Army. If the State of Missouri decides to change the organization, composition and location of the 131st Fighter Wing (ANG) to integrate the unit into the Future Total Force, all other personnel allotted to the 131st Fighter Wing (ANG) will remain in place and assume a mission relevant to the security interests of the State of Missouri and consistent with the integration of the unit into the Future Total Force, including but not limited to air mobility, C4ISR, Information Operations, engineering, flight training or unmanned aerial vehicles. Where appropriate, unit personnel will be retrained in skills relevant to the emerging mission. This recommendation does not effect a change to the authorized end-strength of the Missouri Air National Guard. The distribution of aircraft currently assigned to the 131st Fighter Wing (ANG) is based upon a resource-constrained determination by the Department of Defense that the aircraft concerned will better support national security requirements in other locations and is not conditioned upon the agreement of the state.

 o  Establish 18 PAA F-15 aircraft at the 125th Fighter Wing, Jacksonville International Airport Air Guard Station, Florida (ANG);

 o  Establish 18 PAA F-16 aircraft at the 177th Fighter Wing, Atlantic City International Airport Air Guard Station, New Jersey (ANG);

 o  Establish 18 PAA F-16 aircraft at the 158th Fighter Wing, Burlington International Airport Air Guard Station, Vermont (ANG)."

58

# United States Court of Appeals

For the Seventh Circuit
Chicago, Illinois 60604

September 7, 2005

### Before

**Hon.** FRANK H. EASTERBROOK, *Circuit Judge*

**Hon.** ILANA DIAMOND ROVNER, *Circuit Judge*

**Hon.** DIANE S. SYKES, *Circuit Judge*

| | |
|---|---|
| ROD BLAGOJEVICH, Governor of the State of Illinois,<br>        Plaintiff-Appellant,<br><br>No. 05-3595               v.<br><br>DONALD H. RUMSFELD, Secretary of Defense of the United States of America, ANTHONY J. PRINCIPI, Chairman of the Defense Base Closure and Realignment Commission, JAMES H.  BILBRAY, et al.,<br>        Defendants-Appellees. | ] Appeal from the United<br>] States District Court for<br>] the Central District of<br>] Illinois.<br>]<br>] No. 05 C 3190<br>]<br>] Jeanne E. Scott,<br>]      Judge.<br>]<br>]<br>]<br>]<br>] |

The following is before the court:

    1.    **PLAINTIFF-APPELLANT'S EMERGENCY MOTION FOR INJUNCTION PENDING APPEAL AND FOR EXPEDITED APPEAL,** filed on September 7, 2005, by counsel for the appellant.

    The Governor of Illinois contends that realignment of the 183d Fighter Wing of the Illinois National Guard, based in Springfield, Illinois, would violate 32 U.S.C. §104(c), which provides that "no change in the branch, organization, or allotment of a unit located entirely within a State may be made without the approval of its governor." Governor Blagojevich does not approve of any change in the status of the 183d Fighter Wing. The district court dismissed the suit for want of standing, and we think it likely that this is mistaken. The rights involved are those of the State

speaking through its Governor, who is the appropriate person to vindicate §104(c). And the harm is judicially redressable.

Nonetheless, we deny the application for an injunction pending appeal, because the Governor is unlikely to succeed on appeal, while an injunction could cause irreparable harm to the time-sensitive process of making recommendations under the Defense Base Closure and Realignment Act.

Section 104(c) does not purport to regulate communications or recommendations within the Executive Branch, and those communications are not otherwise final and reviewable agency action. *See Dalton v. Specter*, 511 U.S. 462 (1994). If the Commission recommends to the President, the President proposes to Congress, and Congress approves (or allows to take effect) an action that would transgress §104(c), then the decision will at that point be "final" and reviewable before the National Guard unit is moved or changed. There would then be time enough to consider and decide, with proper deliberation, whether actions taken under the Defense Base Closure and Realignment Act supersede §104(c).

Rovner, *Circuit Judge*, dissenting. It appears to me that appellees' transmission of the report may very well end Governor Blagojevich's ability to assert any rights he may have under 32 U.S.C. § 104(c). I find the majority's conclusion— that the Governor must wait for some later, more permanent action to be taken before he could assert his rights—to be unsupported by caselaw or statute, and disagree that *Dalton* would lead to such a conclusion. And it does not seem that appellees face irreparable harm, as the majority contends, if forced to delay its recommendation for a few days while this court considered the merits of the motion for an injunction. *See* BRAC Act at § 2903(e); 2914(d) (President has fifteen days after receiving Commission report to transmit decision to Congress). In light of the potential harm should the report be transmitted, the arguable merit to this case, and the fact that the entire district court record is not before us (and thus we are not aware if the government has even made the argument raised by the majority that BRAC supersedes § 104(c))—and mindful of the standard for granting an injunction, *see Roland Machinery Co. v. Dresser Industries*, 749 F.2d 380, 386-88 (7th Cir. 1984)—I would have issued a temporary restraining order in this case and directed appellees to respond to the motion for injunction so that we could give these important issues the deliberation they deserve. Accordingly, I respectfully dissent from the decision to deny the motion for injunction.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

September 7, 2005
E-75-E

No. 05-4127

Jon Corzine, et al.,

Appellants

v.

Defense Base Closure and Realignment Commission (2005 BRAC Commission), et al.

(District of New Jersey No. 05-cv-04294)(MLC)

Present:    FISHER, VAN ANTWERPEN and ALDISERT, Circuit Judges

1.    Motion by Appellants for an Order Expediting Review of the Matter and for an
      Order Directing that the Matter be Adjudicated on the Briefs Filed Below;

2.    Supplement by Appellants to clarify that Appellant's are seeking a Stay/Preliminary
      Injunction pending appeal restraining and enjoining the 2005 Base Closure and
      Realignment Commission from transmitting the final report to the President pending
      resolution of the legal issues raised by Appellant.

3.    Brief on Behalf of Amicus Curiae in Support of Emergent Relief

4.    Response in Opposition by Appellee to Emergency Motion for Injunction

/s/Lynn M. Lopez
Lynn M. Lopez
Case Manager (267)299-4922

_____    **O R D E R**    _____

The foregoing motion for expedited consideration and for adjudication on the briefs filed below is
granted. The judgment of the District Court, finding that it lacked subject matter jurisdiction based on
the holding of the United States Supreme Court in Dalton v. Specter, 511 U.S. 462 (1994), is summarily
affirmed. The request for a stay or preliminary injunction pending appeal is denied as moot.

By the Court,

/s/ D. Michael Fisher
Circuit Judge

Dated: September 7, 2005
cc:      FGC
         SS
         KS
         HTB
         DL
         SM